IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00258-REB-JMC

UNITED STATES OF AMERICA,

       Plaintiff,

v.

**JAMARR LANG,**

       Defendant.

_____

**OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT**
_____

Jamarr Lang, by and through undersigned counsel, submits the following objections, clarifications, and additions to the Presentence Investigation Report. Doc. 5.

**I.    Objections and clarifications that impact the applicable guideline range.**

**Objection 1: Paragraphs 34 – 38**

Mr. Lang objects to the application of U.S.S.G. §3A1.2(c)(1), Official Victim Enhancement.

**1. The application of § 3A1.2 relies on commentary that impermissibly expands an unambiguous guideline.**

Mr. Lang's applicable guideline is §2A2.2. Because he was convicted under 18 U.S.C. § 111(b), he receives a 2-level enhancement pursuant to §2A2.2(b)(7).[1] In the Commentary to that guideline, application note 4 directs "if subsection (b)(7) applies, §3A1.2 (Official Victim) also shall apply." That commentary does not interpret or explain §2A2.2, instead it is inconsistent with the plain reading of the guideline and impermissibly expands its plain meaning.

___

[1] "If the defendant was convicted under 18 U.S.C. § 111(b) or 115, increase by 2 levels."

The application note to §2A2.2 expanding a 2-level enhancement to an 8-level enhancement (with the application of §3A1.2) should be afforded no deference in light of *Kisor v. Wilkie,* 139 S. Ct. 2400 (2019) and *Stinson v. United States,* 508 U.S. 36, 43 (1993).[2] In *Kisor v. Wilkie* the Supreme Court's justices all agreed on the need to implement limitations on the deference courts owe an administrative agency like the Sentencing Commission. *Kisor* set out a three-part framework for when, and how, to defer to agency interpretation. First, deference to agency commentary is only required where the rule or regulation is "genuinely ambiguous" and after "exhaust[ion of] all the traditional tools of construction." *Id.* at 2415 (internal quotation marks omitted). "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means..." *Id.* Second, where a rule or regulation is genuinely ambiguous, courts only defer to "reasonable interpretation[s]" that "come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415–16. This means that the "agency construction" of a rule or regulation receives no "greater deference than agency constructions of statutes" under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Kisor*, 139 S. Ct. at 2416. And third, before deferring, "a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.*

*Stinson v. United States* focused on the third constraint, and it held that the Commission's commentary on the Sentencing Guidelines is the type of agency

---

[2] Counsel is aware this Court has held in other instances that *Kisor* is inapplicable to the Sentencing Guidelines as the Guidelines are *sui generis*. Nonetheless, counsel believes the contemplated application runs afoul of *both Kisor* and *Stinson.*

interpretation of its own rules or regulations that is entitled to deference. 508 U.S. 36, 45 (1993). The commentary is not a legislative rule or regulation in its own right because it "is not the product of delegated authority for rulemaking." *Id.* at 44. Rather, "commentary explains the guidelines and provides concrete guidance as to how even unambiguous guidelines are to be applied in practice." *Id*. After examining what *Kisor* would call the "character and context" of the commentary, the Court determined that "commentary is binding on the federal courts even though it is not reviewed by Congress." *Id.* at 46. The Court then determined that a particular application note was binding in the case —but by then this was a foregone conclusion.

The question that *Stinson* does not answer, because it must be asked anew for each and every agency interpretation, is whether a particular commentary is interpreting a genuinely ambiguous rule. Turning to that question, the commentary here fails. USSG §2A2.2 has no ambiguity whatsoever, much less "genuine" ambiguity. Therefore, there is no "possibility of deference" to the expansion of the text through commentary. *Kisor,* 129 S.Ct. 2414, 2415. The text of that guideline has a clear directive – in the case of a conviction under 18 U.S.C. § 111(b), increase by 2 levels. The guideline makes *no mention* of another, wholly separate, increase under §3A1.2.

Even setting aside *Kisor, Stinson* does not allow for this expansion of §2A2.2 because note 4 does *not* interpret or explain that guideline, it expands the guideline to include an uncontemplated enhancement. Imputing the application of §3A1.2 to the statement "in the case of a conviction under 18 U.S.C. § 111(b)" is a clearly erroneous reading of that guideline. *Stinson,* 508 U.S. at 38 ("commentary in the Guidelines Manual

that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

Finally, even if this court finds that §2A2.2(b)(7) is ambiguous, or that the application note "interprets or explains" that guideline in a non-erroneous way, this court should turn to the rules of statutory construction *before* it gives deference to the commentary. In so doing, this court should apply the rule of lenity – one of the original rules of statutory construction. The rule of lenity "requites ambiguous criminal laws to be interpreted in favor of defendants subjected to them." *United States v. Santos,* 553 U.S. 507, 514 (2008). Lenity applies with equal force to the Guidelines, which "exert a law-like gravitational pull on sentences." *United States v. Nasir*, 2020 WL 7041357, *25 (Bibas, J.) (citing *United States v. Booker,* 543 U.S. 220, 265 (2005) (Breyer, J., remedial majority opinion)). Lenity should be prioritized over deference to the application note because this court cannot defer to the Sentencing Commission until after it empties its "legal toolkit" of "all the 'traditional tools' of construction." *Kisor,* 129 S. Ct. at 2418. Applying lenity allows court to avoid constitutional concerns inherent in construing an ambiguous statute against a criminal defendant. Deference in the guideline context which affects how long people will spend in prison only heightens these concerns. *See Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., statement regarding denial of certiorari) (agency deference "has no role to play where liberty is at stake"). When "an otherwise acceptable construction of a statute would raise serious constitutional problems," courts "will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.*

*v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Expanding §2A2.2(b)(7) to include a wholly different enhancement clearly offends the rule of lenity and is therefore impermissible. The two-fold increase in Mr. Lang's applicable guideline range – from a low-end of 33 months to 63 months – epitomizes the dangerousness of giving deference to administrative commentary that is not subject to Congressional approval and is troublingly expansive.

### 2. Mr. Lang did not know or have reasonable cause to believe the person he assaulted was a government officer.

Even if this court relies on the commentary of §2A2.2(b)(7), §3A1.2(c) is still inapplicable to Mr. Lang. In order to apply §3A1.2(c), this court must find by a preponderance of the evidence that Mr. Lang "knew or had reason to know" the person he assaulted was a federal officer. This is distinguishable from the elements of 18 U.S.C. § 111(a) and (b) to which Mr. Lang pled guilty. Those elements require Mr. Lang to "act intentionally" but do not require that Mr. Lang *knew* the person he forcibly assaulted was a "federal officer engaged in the performance of his official duty." Here, there is not evidence that Mr. Lang knew the person he assaulted was a federal officer.

Mr. Lang is a black-out drinker, sustained a traumatic brain injury when he was 14 years-old, and has an intelligence between "low average and intellectually disabled." Doc. 87-2. He does not recall most of the instant offense. Dash camera footage from the incident shows a very intoxicated person. When police officers first arrived to the scene, Mr. Lang can be seen losing his balance and falling backward into the street. It's unclear whether he saw the two police cars approach as he got up, but he did not acknowledge their presence. Neither police car activated their lights and although the dash camera has

no sound, neither officer involved reported activating their sirens. After righting himself, Mr. Lang began walking down a driveway with his back to the officers. Officer Trujillo approached Mr. Lang quickly from behind with just few seconds elapsing between when he exited his patrol car and when he made physical contact with Mr. Lang's back.[3] The camera footage shows that Mr. Lang simultaneously felt Officer Trujillo's presence and turned to make contact with him with the unloaded firearm. The assault lasted approximately five seconds, after which Mr. Lang continued to walk away before being tased, tackled, and ultimately have his nose broken.

Taking together Mr. Lang's intoxication that evening, his intellectual abilities, and the circumstances of the assault, there is insufficient evidence to establish that he "knew or had reasonable cause to believe" the person who contacted him from behind was a law enforcement officer. Therefore, §3A1.2 does not apply.

Without the application of §3A1.2(c)(1), Mr. Lang's adjusted offense level is 23 and his total offense level is 20, as calculated in the Plea Agreement. Doc. 83.

## II.     Objections and clarifications that do not impact the applicable guideline range.

The following objections or clarifications do not impact Mr. Lang's guideline range but may be relevant to the 18 U.S.C. § 3553(a) factors this court considers when imposing sentence, his Bureau of Prisons' designation, or may be utilized by a probation officer

---

[3] Mr. Lang does not (and cannot) dispute Officer Trujillo's statements about his commands and attempts to tase, but it's important to note that approximately 8 seconds elapsed between when Officer Trujillo exited his vehicle and when he made physical contact with Mr. Lang.

upon release. Therefore, the following information should be added, stricken, or corrected, as appropriate.

**Paragraph 6: Warrior Spirit**

Mr. Lang supplements this paragraph with the following information. In June 2022, after discharging Mr. Lang in November 2021, Warrior Spirit accepted him for re-admission. Doc. 49; 49-1. At that time, counsel spoke to Warrior Spirit's Executive Director, Brycen Williams, about Mr. Lang. Mr. Williams noted that, prior to his discharge, Mr. Lang had been progressing and did not demonstrate any "troubling" behaviors. Mr. Williams occasionally worked with Mr. Lang directly and remembers him as "a good client who did seem to make an earnest effort." Mr. Williams also acknowledged that Mr. Lang's treatment team could have done more to address his needs. Specifically, the facility was somewhat understaffed and without a case manager at the time of Mr. Lang's enrollment. Mr. Williams also acknowledged that some of Mr. Lang's difficulties might have arisen from his struggles with literacy, something that was not properly addressed by Warrior Spirit. After Mr. Lang's discharge, Warrior Spirit implemented audio-assistance for their treatment literature. *Id.*

**Paragraph 7: Hilltop House**

Mr. Lang supplements this paragraph with the following information, much of which was put on the record at his revocation hearing in November 2022. When Mr. Lang enrolled in Hilltop House, he was given a written set of rules and regulations to sign, but those rules and regulations were never orally reviewed or explained to him. Mr. Lang has the functional literacy of a second grader and is borderline intellectually impaired. When

7

he explained his literacy deficit to his case manager at Hilltop House she responded, "well that's embarrassing, you're 20." That was not the only time Mr. Lang felt belittled by staff at Hilltop House. His grandmother and mother both reported to counsel suspicions that staff mistreated him because he is Native. They reported experiencing disrespect and derision when they would call the facility to speak to Mr. Lang.

**Paragraph 8: La Plata County Jail**

Mr. Lang denies attempting to assault another inmate. Soon after arriving at La Plata in October 2022, Mr. Lang was placed on suicide watch and experienced significant difficulty with his mental health. Since then, he's attended regular counseling with Axis Mental Health and reports improved mental health. Mr. Lang reports no disciplinary violations since his transfer to Archuleta County Jail in January 2023.

**Paragraph 21: Additional Information**

The information contained in this paragraph is inaccurate and should be stricken or amended, appropriate. As outlined *supra,* approximately 8 seconds elapsed between when officer Trujillo exited his car and when he contacted Mr. Lang from behind. The dash camera does not show a taser being deployed two times before that contact.[4] The video *does not* show Mr. Lang running at officer Trujillo or running at all. Instead, as outlined in the factual basis in the Plea Agreement, Mr. Lang merely turned and struck officer Trujillo.

**Paragraph 23: Additional Information**

---

[4] Mr. Lang does not dispute this fact, just notes that the deployment cannot be seen in the video and that it must have occurred in a very short amount of time.

Hospital records from this visit confirm that Mr. Lang's nose was broken. *See* Doc. 87, ¶ 64. Mr. Lang reports suffering headaches since the time of his arrest.

**Paragraph 70: Marijuana Use**

Mr. Lang maintained sobriety from all substances from April 28, 2021 until September 2022. He used marijuana approximately once a week (not daily) for a few weeks preceding his discharge from Hilltop House.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/Laura Suelau
LAURA SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
laura.suelau@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 24, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

    Riley J. Player, Assistant United States Attorney
    Riley.Player@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

    Jamarr Lang (U.S. Mail)

    s/Laura Suelau
    LAURA SUELAU
    Assistant Federal Public Defender
    633 17th Street, Suite 1000
    Denver, CO  80202
    Telephone:  (303) 294-7002
    FAX:  (303) 294-1192
    laura.suelau@fd.org
    Attorney for Defendant