IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00258-REB-JMC

UNITED STATES OF AMERICA,

       Plaintiff,

v.

**JAMARR LANG,**

       Defendant.

_____

**MOTION FOR VARIANT SENTENCE**
_____

Jamarr Lang, by and through undersigned counsel, respectfully requests this Court impose a variant sentence of 18 months incarceration and two years of supervised release.[1] Mr. Lang committed this offense in April 2021 when he was 18 years old and during a particularly difficult time in his life. A year into the COVID-19 pandemic, Mr. Lang was among a cohort of people markedly negatively impacted by the pandemic: a Native American high school student. Under just those circumstances, 2020 would have been a difficult year, but Mr. Lang's difficulties were compounded when his best friend, Eli Cantsee, was killed in a tragic accident.[2] Mr. Lang was ill-equipped to deal with the loss and began a precipitous downward spiral, culminating seven months later with the instant offense. The circumstances of the year prior to this offense, and Mr. Lang's history and characteristics, support a variant sentence of 18 months incarceration.

---

[1] 18 months is the middle of the range contemplated by the Rule 11(c)(1)(C) Plea Agreement in this case.

[2] The Journal, *Pedestrian Killed South of Cortez is Identified,* https://www.the-journal.com/articles/pedestrian-killed-south-of-cortez-is-identified/ (Sept. 18, 2020) ("Cantsee, 19, was in the southbound lane of traffic on South Broadway near Chronic Therapy when he was hit by a southbound pickup truck and semitrailer... Cantsee was facing north when struck, and he died of blunt force trauma at the scene.").

### I.     Mr. Lang's childhood was difficult and filled with obstacles.

Jamarr Lang was born to Justin Lang and Marettas Frost in 2002.[3] At the time, Mr. Lang and Ms. Frost abused alcohol and drugs and had a highly contentious relationship. As a result, Jamarr lived with his grandmother, Juanita Frost. Juanita loved and endeavored to care for her grandson, but the arrangement was not always ideal. Juanita lived in retirement housing and Mr. Lang was the only child in the complex. Mr. Lang (and other family members) report that Juanita has an erratic temper and would lash out in anger at her young grandson. Mr. Lang felt an unusually high-level of responsibility for her moods and happiness – "I feel like I made her happy, but also that I caused all her stress." It was a heavy burden for a child to carry. When Mr. Lang was 16 years-old, his parents tried to regain custody, but Juanita rebuffed their attempts leading this inter-family strife and tension. Mr. Lang remembers feeling like his grandmother would be angry if he said he wanted to go live with his parents and other siblings, so he remained silent. It is difficult to say whether living with Marettas Frost would have been preferrable at that time as she was charged with a federal felony in 2019.[4]

Although he felt physically safe and cared for with his grandmother, growing up in Towaoc on the Ute Mountain Ute reservation necessarily exposed him to poverty, substance abuse, violence, and resource-poor institutions such as schools. A 2014

---

[3] The information contained herein is based on the Presentence Interview, records received and reviewed by counsel, Dr. Susan Coykendall's evaluation of Mr. Lang (Doc. 93-2), and counsel's interviews with Mr. Lang, Kenny Frost (grandfather), Juanita Frost (grandmother), Marettas Frost (mother).

[4] A Sentencing Statement filed by Ms. Frost's counsel in that case make clear that she was struggling with alcoholism prior to that offense and that her drinking negatively impacted her children. 19-cr-00002-REB-JMC, Doc. 45.

Department of Justice Report on American Indian Children entitled "Ending Violence so Children Can Thrive," outlines some of these endemic problems.[5] The report describes overwhelming poverty, epidemic suicide, combat-level rates of PTSD, and low education levels among native youth. The DOJ's resulting initiative sought to "prevent children's exposure to violence; mitigate the impact of children's exposure to violence when it does occur; and develop knowledge and spread awareness about children's exposure to violence." *Id.* In the meantime, "[c]ontinual exposure to violence has a devastating impact on child development and can have a lasting impact on basic cognitive, emotional, and neurological functions. We cannot stand by and watch these children—who are the future of American Indian and Alaska Native communities—destroyed by relentless violence and trauma." *Id.*

Mr. Lang is among the children impacted by violence and trauma on reservations. When he was 14 or 15, he lost a cousin to suicide. In January 2019, when he was 16, the Ute Mountain Ute community in Towaoc (a town of just 1,100) lost two middle school students in a single weekend to suicide.[6] Mr. Lang himself has had suicidal thoughts on and off for years and was placed on suicide watch at the La Plata County Jail in November 2022. Nonetheless, his grandmother never enrolled him in therapy or mental health treatment.

---

[5] "Native Youth Report," https://www.justice.gov/sites/default/files/defendingchildhood/pages/attachments/2014/11/24/aian_executive_summary.pdf.

[6] Denver Post, *Two Colorado middles school students from Ute Mountain Ute Tribe die by suicide over the weekend,* https://www.denverpost.com/2019/01/24/colorado-middle-school-suicide-ute-mountain-tribe/ (Jan. 24, 2019).

Mr. Lang also suffered due to the poor quality of education provided in Towaoc. He has struggled in school for as long as he can remember. Although he was in Special Education classes and had an Individualized Education Program from a young age, records reflect that Mr. Lang was passed from grade to grade despite failing grades and deficits in most areas – particularly reading – and it is unclear what services he actually received from the IEP. As a result, Mr. Lang (and others) report that he continues to read at a very low level and struggles to comprehend concepts that others might consider basic, something that has caused him significant stress throughout his life and schooling. As he got older (particularly given his size) people expected that he was an adult who could read and comprehend and treated him accordingly.

Dr. Susan Coykendall evaluated Mr. Lang in November 2022. Her report outlines much of Mr. Lang's history and distills his "intellectual impairments" – impairments she concluded "affect his daily function." Doc. 93-2. Dr. Coykendall found he suffers deficits in reading, writing, and numbers and has poor focus, attention and memory. He also has compromised executive functions, including "problem-solving skills, ability to rationally make decisions, and management of sophisticated or complex input." *Id.* Dr. Coykendall noted that the source of Mr. Lang's deficits and impairments is difficult to pin down given his complex history, but emphasized the adverse impacts of "poor quality of schooling along with lack of access to resources and opportunities that would affect one's general fund of knowledge." Doc. 93-2.

Compounding his problems, Mr. Lang suffered a brain injury in 2017 when he was 14 years old. Mr. Lang fell off his skateboard, hit his head, and after initial treatment at

Southwest Memorial in Cortez, was flown to the Pediatric Intensive Care Unit at Denver Health. Records from that visit show Mr. Lang suffered a subdural hematoma, concussion with loss of consciousness, and a scalp laceration. After a few days, Mr. Lang was released with few aftercare instructions and no follow-up was done despite the fact that he continues to suffer from throbbing headaches and light-headedness. These symptoms worsened after he suffered a second head injury when he was arrested in this case. Although he cannot recall the details, his nose was broken, and his head felt sore and beaten in the aftermath of his arrest.

When Mr. Lang was 17, the COVID-19 pandemic halted whatever inadequate schooling he was receiving and forced him to attend class online. Like many residents in Towaoc, Mr. Lang did not have reliable access to the internet and his already-mounting frustrations with school led him to drop-out.[7] At the same time, the virus infected and impacted American Indian communities at an alarming rate: "three-and-a-half times greater than white Americans, hospitalization rates are four times higher; and rates of death [were] twice as high. For the more than one million Native Americans who live on reservations across the country, COVID-19 has threatened every part of their existence."[8]

---

[7] Colorado Broadband Office, *Broadband and the Ute Mountain Ute Tribe During the Pandemic,* https://broadband.colorado.gov/news-article/broadband-and-the-ute-mountain-ute-tribe-during-the-pandemic (Nov. 17, 2020) ("The majority of the affected clients live in and around the town of Towaoc, an eight-square mile area with approximately 200 homes. A large portion of this population are living in poverty. Many access the internet via pay as you go mobile phone services with limited data plans. Because these mobile plans offer low bandwidth and data caps they are unable to support the teletherapy, telehealth, eLearning, and public safety needs of the tribal members.")

[8] 5280 Magazine, Inside the Ute Mountain Ute Tribe's Bold Response to the COVID-19 Pandemic, https://www.5280.com/inside-the-ute-mountain-ute-tribes-bold-response-to-the-covid-19-pandemic/ (Dec. 2021).

In order to protect their tribal members, Ute Mountain Ute officials put in place aggressive restrictions, causing tension and disharmony within the small tribe. Mr. Lang found himself trapped in the crosshairs, confused, and rudderless. He began drinking almost daily and regularly blacked out.

On September 18, 2020, he was drinking with friends, including his best friend, Eli Cantsee. At some point, the two separated and Mr. Cantsee began walking in the road where he was struck by two vehicles and killed. Mr. Lang was devastated. He served as a pallbearer at Eli's funeral but secretly blamed himself. He believed if he were there, he could have somehow prevented the death. After Eli's death, Mr. Lang rarely took a sober breath except when he was in tribal jail for various minor offenses he committed while drinking. At 18 years-old, his skin was already jaundiced from his drinking, and he did not care – he wanted to die.

Notably, the turmoil of 2020 globally, and for Mr. Lang personally, happened when his brain was still developing and maturing. Because brains continue to develop well into a person's 20s, juveniles are particularly susceptible to peer pressures and poor decision-making.[9] When coupled with the forgoing, Mr. Lang's undeveloped brain made him vulnerable to the poor decisions that lead him to commit the instant offense.

## II.     This offense triggered significant changes in Mr. Lang's life.

The instant offense marked the culmination of a very difficult year in Mr. Lang's life. Instead of completing his senior year of high school and celebrating milestones like

---

[9] Harvard Medical School, *Juvenile Justice and the Adolescent Brain,* https://clbb.mgh.harvard.edu/juvenilejustice/ (compiling sources on brain development).

prom and graduation, he was filled with alcohol, grief, and misery. This serious crime with very serious consequences became a significant, but in many ways positive, turning point for Mr. Lang. Although an imperfect journey, he has undergone substantial post-offense rehabilitation in the last two years. Mr. Lang has not taken a sip of alcohol since April 2021, something about which he has great pride. He's received treatment and counseling services for the first time in his life. Although he was ultimately discharged from the Warrior Spirit treatment program for rules violations, Mr. Lang reports learning tools there for future success. Likewise, the director at Warrior Spirit reported that Mr. Lang was progressing and made and earnest effort during treatment. After he returned to custody in November 2021, Mr. Lang did not give up. He enrolled in Axis Behavior Health Services at La Plata County Jail. In June 2022, his counselor at Axis wrote a letter in support of his re-enrollment at Warrior Spirit stating "Jamarr has made significant progress towards treatment goals, increased self-awareness, and communication skills, practiced coping and distress skills, and improved taking accountability for his choices." Doc. 54-1 (Exhibit to Motion to Reopen Detention). Mr. Lang continues to participate with Axis at Archuleta County Jail.[10]

When Mr. Lang was eventually released in mid-2022 and resided at Hilltop House in Durango, it was the first time he'd lived in a non-custodial setting without his family. To his credit, he did not drink and obtained his first-ever job as a dishwasher at Denny's. He

---

[10] Counsel anticipated, but did not receive, updated treatment records from Axis before this filing. Axis did, however, confirm Mr. Lang's participation.

enjoyed the work and hopes to return there upon his release from custody.[11] He also began GED courses.

Finally, Mr. Lang has spent the last two years working to improve and strengthen his relationships with his family. He has great regret for how his actions negatively impacted his family – particularly his grandmother and younger siblings. His mother is now sober and on the cusp of completing her own term of federal supervision and he looks to her and his father for support and guidance.

*Pepper v. United States* mandates this Court consider Mr. Lang's rehabilitative efforts over the past two years and sentence him as he stands before it in April 2023, not April 2021. 562 U.S. 476, 491 (2011). Mr. Lang's progress is remarkable, especially considering his young age, upbringing, and intellectual limitations.

### III. A plan for future success.

Mr. Lang (now 20) hopes to continue these rehabilitative efforts upon his release. He knows he has a long road ahead of him and is starting from a deficit, but with the proper services and guidance, he can be successful. Dr. Coykendall made several specific recommendations to help guide him through his next steps. Those include Cognitive Behavioral Therapy, continued abstinence from alcohol, and setting goals for obtaining his GED and working towards a career. He intends to do those things and also hopes to build a support network of the type she recommends. He anticipates joining a program like Alcoholics Anonymous and getting a sponsor. Two years of supervision will

---

[11] Issues with the staff at Hilltop House that contributed to Mr. Lang's termination are outlined in his Objections to the Presentence Report. Doc. 90.

help him make a start towards these goals. He's had the unique benefit of seeing his mother get positive support from the U.S. Probation Office and be successful. He is hopeful he can do the same.

### IV. A lengthy term of incarceration is not proper treatment for Mr. Lang.

More incarceration will not help Mr. Lang achieve his goals, or the goals of sentencing, and may harm him. It is unlikely he will receive any substance abuse or mental health treatment in the Bureau of Prisons. However, his age and intellectual abilities may make him particularly vulnerable to manipulation, negative influences, and predatory inmates that might target young people in prison. It is not unreasonable to fear that people might see Mr. Lang's size and try to manipulate him to do things he would not otherwise. Indisputably, incarceration in and of itself is traumatic, particularly for young people who've suffered other adverse childhood experiences.[12] Nor does additional incarceration make it less likely that Mr. Lang will re-offend. Empirical evidence demonstrates the opposite: lengthy incarceration for youth offenders increases recidivism, impedes future success, and does lasting damage to young people's health and wellbeing. *Id.* Instead, Mr. Lang needs community-based programs of the type outlined *supra* and recommended by his Conditions of Supervised Release. *Id.*

### V. Conclusion.

Mr. Lang recognizes the seriousness of this crime. He knows that his path of self-destruction harmed himself, his family, and his community. He does not want to continue

---

[12] The Sentencing Project, *Why Youth Incarceration Fails: An Updated Review of the Evidence,* https://www.sentencingproject.org/reports/why-youth-incarceration-fails-an-updated-review-of-the-evidence/ (Mar. 1, 2023).

down that path – the path he's seen taken too often by family members and others in Towaoc. A sentence of 18 months is a sufficient by not greater than necessary sentence to impress upon him the seriousness of this crime and the necessity of making different choices in the future. That sentence also recognizes his history and the circumstances that led him to his actions on April 28, 2021. 18 months incarceration followed by two years of Supervised Release is the appropriate sentence in this case.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/Laura Suelau
LAURA SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
laura.suelau@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Riley J. Player, Assistant United States Attorney
Riley.Player@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Jamarr Lang (U.S. Mail)

s/Laura Suelau
LAURA SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
laura.suelau@fd.org
Attorney for Defendant

11